IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2011

## DREW DAVID KIRKMAN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Bradley County**
**No. 09-219      Carroll Ross, Judge**

---

**No. E2010-02296-CCA-R3-PC - Filed April 25, 2012**

---

The petitioner, Drew David Kirkman, appeals the Bradley County Criminal Court's denial of his petition for post-conviction relief. The petitioner stands convicted of two counts of first degree murder and one count of aggravated robbery and is currently serving an effective sentence of life in prison plus twenty years. On appeal, the petitioner contends that the post-conviction court erred in denying him relief because he was deprived of his right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective by: (1) failing to adequately prepare for trial and communicate with the petitioner; (2) arguing the motion to suppress on the day before trial which precluded proper review by the trial court; (3) failing to strike two jurors from the panel; and (4) failing to perfect and present a mental defense. Following review of the record, we find no error and affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

David K. Calfee, Cleveland, Tennessee, for the appellant, Drew David Kirkman.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Robert Steven Bebb, District Attorney General; and Drew Robinson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## Procedural History

The relevant facts underlying the petitioner's convictions, as summarized by this court on direct appeal, are as follows:

According to a statement given by the [petitioner] to the police, the [petitioner] was involved in a check cashing scheme with several other individuals, including Elka Fallis, Jeff Cross, Daniel Goldston, and Candace Tracy Clayton. The [petitioner] said that on the evening of Monday, January 28, 2002, Fallis became upset, claiming that Goldston and Clayton were attempting to "screw over" the other members of the operation. Fallis then suggested that she, the [petitioner], and Cross go over to the residence Goldston and Clayton shared to "pop" them, meaning shoot them. The three then went over to Goldston and Clayton's residence, where a heated argument occurred between Goldston and Fallis. The [petitioner] claims he calmed down Fallis and Goldston before the argument escalated further.

The next morning, the [petitioner] reported to his parole officer, Nancy Baker, for a general intake. At the motion to suppress hearing, Baker testified that she gave the [petitioner] a drug test, and he tested postive for cocaine, amphetamines, and THC. Baker testified that at the time of the intake, she told the [petitioner] that she was not going to "violate him" that morning, but that "he better be clean the next month." However, on February 4, after the [petitioner] had been arrested in the instant case, Baker filed a probation violation warrant. Baker also testified that she did not request that the [petitioner] be held without bond on the misdemeanor possession charge.

The [petitioner] told police that he, Fallis, and Cross returned to Goldston and Clayton's residence the evening of Tuesday, January 29. After a brief discussion, Goldston began smoking crack cocaine before handing the crack pipe to the [petitioner]. While the [petitioner] was smoking, Fallis began shooting at Goldston and Clayton. The [petitioner] claimed that he stabbed Goldston once in the back, breaking his knife, and that Cross may have stabbed one of the victims. After the [petitioner] stabbed Goldston, he saw Fallis hit Clayton with a table leg. The [petitioner] also stated that he hit Goldston "quite a few times" with a club. The three then left the residence, with the [petitioner] taking knives and $400 in cash from Goldston's pocket on the way out. After the [petitioner] returned to his apartment, he took several bags containing items taken from the victims' apartment to a dumpster. The [petitioner] also gave someone, whom he did not identify, a typewriter

-2-

used in the check cashing scheme and a gun. The [petitioner] told this person to "get rid" of the gun in a creek.

The [petitioner] told police that Elvenia Franklin took him to work Tuesday night. At trial, Monte Boring testified that he worked with the [petitioner] that night at Advanced Photographic Solutions. According to Boring, the [petitioner] said that he "took care of that n--r what was causing us trouble." Boring claimed that the [petitioner] then said, "[y]ou'll read about it in the papers," and that the [petitioner] mentioned that he had gotten his knife back, as well as something about a carpet being cleaned. Later, Boring heard news reports about Goldston's murder. In his first statement to police, the [petitioner] denied making these statements to Boring. Rather, the [petitioner], who said he was under the influence of drugs when he reported to work that evening, claimed that he told Boring that he was "f-ed up as two n-s." In his first statement to police, the [petitioner] expressed concern that he was being implicated in the crime by Boring, a known drug addict.

Franklin testified that she took the [petitioner] home from work after his shift ended Wednesday morning. At that point, the [petitioner] gave Franklin a typewriter used in the check cashing scheme. A short while later, Franklin followed the [petitioner] to Fallis's house, where the [petitioner] gave Franklin a small handgun.

Lieutenant John Dailey with the Cleveland Police [D]epartment testified that he investigated the crime scene. Lieutenant Dailey stated that Clayton had suffered a severe head injury, as well as other injuries to her torso. He also noticed that a coffee table had two legs broken, with one missing and one located next to Clayton's body. Lieutenant Dailey testified that Goldston had suffered visible head injuries, and additional examination revealed stab wounds and gunshot wounds. Goldston also had a knife blade sticking out of his back, with the handle broken off. Throughout the residence, Lieutenant Dailey noted several shoe prints which appeared to be made by a K-Swiss sneaker. He also saw a broken club lying next to Goldston, [which] contained what appeared to be blood and human hair, though the officer did not indicate the color of the hair or to whom it belonged. Tennessee Bureau of Investigation (TBI) Special Agent Bradley Everett later performed tests on the club that indicated the club contained blood from both victims.

Dr. Ronald Toolsie, who conducted the autopsies of both victims, testified at trial that Clayton suffered massive blunt trauma injuries to her face

and scalp. In his autopsy report, Dr. Toolsie ruled the death a homicide, with the cause of death being "[m]assive craniocerebral injuries with skull fractures due to multiple injuries to left face, left parietal scalp and left occipital scalp." Dr. Toolsie testified that Goldston suffered six stab wounds to the back and two gunshot wounds, which Dr. Toolsie claimed were consistent with the victim being shot while lying face-down. According to Dr. Toolsie, these wounds were fatal. Goldston also suffered blunt force trauma to the back of the head; according to Dr. Toolsie, "[Goldston] looked like he'd been struck four times with a hard, hard-edged but blunt object that caused the skin of the back of the scalp to split."

Early on the morning of Thursday, January 31, Lieutenant Dailey received a call at home ordered him back to work. According to Lieutenant Dailey, he was told only "that someone had called in with a tip about [the petitioner], and that they had gone over to get him and were bringing him down." Lieutenant Dailey later learned that Boring had called in the tip; however, the record is devoid of any information regarding the contents of the tip, the time at which Boring contacted police, or who took Boring's initial statement. Nobody who talked to Boring testified at trial, and Boring's trial testimony did not include information about his initial tip to police. Lieutenant Dailey testified that he arrived at the police station at 1:30 a.m. and that the [petitioner] was already present when he arrived. Lieutenant Dailey testified that he took a statement from Boring as well as from the [petitioner].

At the suppression hearing, the [petitioner] testified that after arriving at work late Tuesday night, several officers arrived at his workplace and entered his work area. The [petitioner] claimed that he was under the influence of drugs that evening, but he also claimed that he was doing nothing wrong at the time the police confronted him. The [petitioner] claimed the police grabbed him, made him stand up, and then placed his arms behind his back and searched him. According to the [petitioner], the police took his cigarettes and keys, and he had nothing else in his pockets at the time. Then, the [petitioner] claimed the police handcuffed him and led him outside. The [petitioner] asked the police why he was under arrest; according to the [petitioner], one of the officers said "You're not under arrest. You're going to tell us what we want to know." The [petitioner] said that another officer then approached him; this officer did not search the [petitioner], but he showed the [petitioner] a bag of marijuana and stated that the [petitioner] was under arrest for simple possession of marijuana. According to the [petitioner], the police transported [him] to the Cleveland Police Department, where the

officers left him shackled and handcuffed to a wooden bench. The [petitioner] claimed he was chained to the bench leaning backward, so that he could not lie down or get comfortable. The [petitioner] claimed he was in that position for at least a couple hours before he spoke with Lieutenant Dailey.

Mike Kelley, a former coworker of the [petitioner's], testified that he was working with the [petitioner] the morning [the petitioner] was taken to the police station. Kelley stated that "eight or nine" officers arrived and took the [petitioner] away. Kelley stated that the [petitioner] did not appear to be under the influence of drugs at the time he left the store. Kelley stated that he did not witness the police search the [petitioner] and did not remember hearing any officer saying anything about the [petitioner] possessing any marijuana.

According to Lieutenant Dailey, he interviewed the [petitioner] in his office at the Cleveland Police Department. The transcript of the interview indicates that it began at 2:33 a.m. and ended at 3:33 a.m. During the interview, the [petitioner] denied involvement in the victims' murder. The [petitioner] named several person with whom he associated and did drugs, including a woman named Robin Fiveash. Lieutenant Dailey testified that the [petitioner] signed a Miranda waiver before the interview, and that during the interview the [petitioner] did not appear to be under the influence of drugs or alcohol, appeared to understand the questions asked of him, did not say that he did not wish to speak to police, and did not ask to speak to an attorney.

Later in the interview, Lieutenant Dailey asked the [petitioner] about what type of shoes the [petitioner] wore. The [petitioner] responded that he owned a pair of K-Swiss shoes. The officer asked if he could go to the [petitioner's] apartment and take an impression of the shoes. The [petitioner] replied that the officer could do so. According to Lieutenant Dailey, he and the [petitioner] then went to the [petitioner's] apartment, where Lieutenant Dailey located the shoes in a tied garbage bag located next to a garbage can. Lieutenant Dailey then asked the [petitioner] if he could take the shoes; the [petitioner] replied that the officer could take them. Lieutenant Dailey then took the shoes and the other contents of the bag, some of which contained blood, into custody. TBI Agent Everett's tests confirmed that the shoes contained Candace Clayton's blood. However, TBI Special Agent Linda Littlejohn testified that although the [petitioner's] shoes were consistent with prints left at the crime scene, no unique identifying marks could lead her to conclusively state that the [petitioner's] shoes made the prints left at the crime scene.

-5-

At 7:00 a.m. on January 31, a search warrant was issued for the [petitioner's] residence. However, Lieutenant Dailey testified that nothing of evidentiary value was obtained from the search conducted pursuant to the warrant.

According to the [petitioner], he was transported from the Cleveland Police Department to the Bradley County Justice Center at 9:30 a.m. on January 31. The [petitioner] said he was held shackled in the "drunk tank" until his hearing before the magistrate at 1:30 that afternoon. The [petitioner] claimed that at the probable cause hearing, he was unable to ask for bond because Shari Tayloe, an Assistant District Attorney, "stood up and said that she was going to try to get a violation on me, that she believed I was on probation." The [petitioner] claimed that after the hearing at which the [petitioner] was charged with possession of marijuana and apparently denied bond, he was held for a while in the Justice Center before being transported back to the Cleveland Police Department. The [petitioner] claimed that he asked for a phone call and asked to speak to a lawyer, but these requests were denied.

At trial, Elvenia Franklin testified that at some point on January 31, the [petitioner] did call her. Franklin said that the [petitioner] asked her to bring the typewriter and gun he had given her to Lieutenant Dailey "so he could prove he wasn't the only one involved." Franklin said that she brought the typewriter to police but that she threw the gun into a creek. Franklin eventually pointed police to the creek where she deposited the gun, and the gun was recovered. TBI Special Agent Don Carman testified that his tests confirmed that the gun, a .22 caliber pistol, was used during the offense.

At some point on the afternoon of January 31, Robin Fiveash, one of the persons mentioned in the [petitioner's] initial statement, was contacted by police. According to Lieutenant Dailey, Fiveash gave a statement "in confidence" to Detective Robert Harbison because "she didn't want Mrs. Fallis to know what she was saying." Fiveash told Detective Harbison that she saw the [petitioner] place several items into a dumpster located at the Superior Cash Mart, located next door to his apartment. After gaining permission from a worker at the market, Dailey and other Cleveland Police officers searched the dumpster, retrieving a coffee table leg that appeared to be from the victims' apartment, several knives, a knife handle that was missing its blade, victim Clayton's pocketbook, Post-It notes addressed to "Drew," and some bloody gloves. TBI Agent Everett testified that his tests confirmed that the victims'

-6-

blood was on the gloves. Agent Everett testified that a broken knife blade retrieved from the dumpster tested positive for victim Goldston's blood, as did a knife handle retrieved from the dumpster. Agent Everett's report indicated that the table leg retrieved from the dumpster tested positive for Goldston's blood, and although Clayton's blood did not appear on the table leg, Dr. Toolsie testified that the table leg "could very well have" inflicted the bruising patterns discovered on her body.

Following her initial, unrecorded statement to police, Fiveash gave a statement to police the afternoon of January 31. In that statement, Fiveash did not mention the dumpster. Fiveash did not mention the [petitioner] placing items in the dumpster in a formal, recorded statement to police until Friday, February 1, after the police had actually retrieved the items from the dumpster.

At 7:02 p.m. on Thursday, January 31, the [petitioner] gave a second statement to Lieutenant Dailey. According to the officer, the [petitioner] voluntarily signed an admonition and waiver form. Lieutenant Dailey stated that shortly after signing the waiver, the [petitioner] asked to take a break and smoke a cigarette. Lieutenant Dailey granted the [petitioner's] requests, after which the [petitioner's] statement resumed. According to Lieutenant Dailey, the [petitioner] did not appear to be under the influence of drugs and appeared to understand the questions he was asked. The officer also said that the [petitioner] did not state that he wished to speak to an attorney and did not ask to end the discussion. According to Lieutenant Dailey, the only issue the [petitioner] raised with him was that the [petitioner] "felt like that I told him he could make bond and then he didn't get to. And then I advised him, 'I set a bond on it. I can't help what happened once you got in front of the Judge.'" The [petitioner] then gave an account of the events that led to the victims' deaths.

At the suppression hearing, the [petitioner] claimed that he did not signed the admonition and waiver form. When shown the admonition and waiver form, the [petitioner] claimed that the signature that appeared on the "signature" line did not match his signature. The [petitioner] claimed that he asked for a lawyer before making the second statement, but defense counsel ultimately admitted that no mention of the [petitioner] asking for a lawyer actually appears in the transcript of the interview. The [petitioner] also claimed that the police knew about his history of mental illness and treatment for that illness. At the preliminary hearing, Lieutenant Dailey admitted that the [petitioner's] criminal history was run "an hour or so after the first interview,"

and upon seeing the [petitioner's] criminal history, he discovered that the [petitioner] had been found not guilty in a previous homicide case by reason of insanity.

*State v. Drew David Kirkman*, No. E2006-01152-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Oct. 10, 2007). As a result of these actions, the petitioner was convicted by a Bradley County jury of two counts of first degree premeditated murder, two counts of felony murder, and two counts of aggravated robbery. Following merger of the premeditated and felony murder convictions, the petitioner was sentenced to an effective sentence of life in prison plus twenty years. The petitioner filed a direct appeal to this court. One issue raised on appeal was the denial of the motion to suppress various statements made by the petitioner. *Id*. This court concluded that the trial court erred in denying the motion to suppress the petitioner's first statement based upon an illegal arrest. This court also concluded that the petitioner's shoes were illegally seized and, thus, improperly admitted at trial. However, this court found that the petitioner's second statement, in which incriminated himself, was validly admitted because there were sufficient intervening circumstances to purge the taint of the illegal arrest. *Id*. Finding that the improper admissions constituted harmless error, this court affirmed the convictions. *Id*.

Thereafter, the petitioner filed a timely pro se petition for post-conviction relief alleging, among other grounds, ineffective assistance of counsel. Following the appointment of counsel, an amended petition was filed. A hearing was subsequently held, at which trial counsel, a friend of the petitioner, the petitioner, and two doctors offered testimony. Trial counsel was the first witness called and testified that he was appointed to represent the petitioner in this case following the preliminary hearing and continued to represent him through the appellate phase. He testified that he met with the petitioner approximately four or five times at the jail, as well as during court proceedings. Trial counsel stated that he spent "an inordinate amount of time" working on the case, talking to witnesses, meeting with people, and investigating. Trial counsel acknowledged that he did not have that many meetings with the petitioner, but he stated that he felt it was more than an adequate amount of time to prepare for the case and, further, that his time was better spent investigating. In the meetings which did occur with the petitioner, trial counsel testified that they discussed the charges, sentencing ranges, trial strategy, and relevant defenses.

Early in his representation of the petitioner, trial counsel learned that the petitioner had been charged, as a juvenile, with the murder of his father. He also learned that the petitioner had been found not guilty of the crime by reason of insanity. Trial counsel testified that he investigated this earlier case to see if it provided any possible information which could aid in the instant defense. He indicated that he contacted Dr. Kathleen Heide, who had assisted in the petitioner's earlier defense in Florida, two to three times and read a book

which she had written about the petitioner. Although he did request the records from Dr. Heide, trial counsel testified that she did not perform an evaluation of the petitioner in this case.

However, in order to further explore the possibility of an insanity defense in this case, trial counsel testified that he requested, and was granted, funds to have a mental evaluation of the petitioner conducted. He contacted Dr. Diana McCoy to conduct the evaluation, and she furnished him with a report, which indicated that insanity was not a viable defense in the instant case. Following that information, trial counsel felt the only viable defense to pursue, based upon the facts of circumstances of the case, was that the murders had not been premeditated but rather "a disagreement gone bad."

Trial counsel also testified regarding the motion to suppress which he filed in the case. He stated that he felt very strongly that there were irregularities in the arrest of the petitioner and raised this issue in the motion. He also included a motion to suppress all evidence based upon the way the petitioner was treated in the General Sessions Court. However, the trial court denied the motion. On appeal, trial counsel testified that he again vigorously argued for suppression. This court, while finding that certain aspects were improper, found any improprieties to be harmless error.

With regard to co-defendant Jeffery Cross, trial counsel testified that he tried very hard to locate Mr. Cross in order to conduct an interview with him prior to the trial. However, Mr. Cross could not be located in spite of all the efforts exerted. Trial counsel also testified that he did not call some witnesses which he had conducted interviews with to testify, either because they would not support the petitioner's defense or because they would not have made good witnesses in his opinion. Trial counsel specifically testified that he did not call the petitioner's mother to testify because he did not believe that she would make a good witness and because she could possibly implicate herself in the check-kiting scheme. According to trial counsel, this was decision was made after discussion with the petitioner.

The next witness called was Jeffrey Cross, who was currently incarcerated in a separate matter. At the time of the murders, Cross related that he was interviewed by the police and gave a statement. He further testified that he did not speak with trial counsel because he knew that the State wanted him to testify against the petitioner and he did not want to do so. As a result, he left the area and went to Orlando in order to avoid the subpoena.

Dr. McCoy, a clinical psychologist, was then called to the stand. She indicated that she had been contacted by trial counsel to conduct an evaluation of the petitioner. She stated that trial counsel gave her the background information, including his prior acquittal based

upon insanity. Dr. McCoy indicated, however, that she was not sure that she ever received all of the petitioner's medical records. Following her evaluation of the petitioner, she concluded that the petitioner did not have a psychological defense in this case. The main reason for her conclusion was that she had difficulty reconciling what the petitioner told her had happened at the crime scene with his second statement to police. Dr. McCoy indicated that she did not anticipate testifying at trial because she did not have an opinion favorable to the petitioner and because she had issues with his credibility. As a result, Dr. McCoy sent all of her records back to trial counsel. Thereafter, in what she believed was the middle of trial, trial counsel called her and asked her to come testify the following day. Dr. McCoy was unavailable to do so. While testifying, she reiterated her opinion that the petitioner did not have a defense based upon insanity.

Dr. Heide, a professor and a licensed mental health counselor, also testified at the hearing. She indicated that she first met the petitioner in 1987 after he was charged with killing his father. He was referred to her because she specialized in dealing with juveniles who had killed their parents. Based upon her evaluation and findings, as well as those of other experts, the petitioner was found not guilty by reason of temporary insanity. During this evaluation of the petitioner, Dr. Heide identified a certain family dynamic in the petitioner's family. She detailed a history of verbal and physical abuse directed towards both the petitioner and his mother. Dr. Heide also indicated that the petitioner's mother had come to essentially look to the petitioner for protection and emotional support, a relationship more typically fulfilled by a spouse.

After learning of the petitioner's instant crimes, Dr. Heide was contacted by trial counsel and eventually received a release allowing her to share her records with Dr. McCoy. She testified that she had no other contact with trial counsel despite her offer to evaluate the petitioner on a pro bono basis. However, after the petitioner's conviction, Dr. Heide met with him on two occasions. Based upon the petitioner's statement that the victims in this case had involved his mother in the check-kiting scheme, Dr. Heide testified to possible parallels to the Florida case, specifically that the petitioner's actions were based, at least in part, on a desire to protect his mother. However, Dr. Heide conceded that she had not been afforded access to all the pertinent records in this case, so her conclusions were based strictly upon her prior knowledge and the petitioner's comments. She maintained that there was a provocation aspect to this case which was not fully explored.

The final witness called was the petitioner himself. He indicated that he only met with trial counsel five times and that trial counsel did not adequately discuss the case with him. The petitioner stated that he believed that trial counsel should have contacted Dr. Heide to perform an evaluation, as well as other professionals with whom he had sought counseling. He indicated that Dr. Heide would have presented "the mental state and the mind frame that

could have been looked at at the time, due to the, you know, the, the provocation of the [victims] . . . ." He also faulted trial counsel for failing to sufficiently raise the issue that the petitioner had been diagnosed and suffered from post-traumatic stress disorder. The petitioner also indicated that, in his opinion, trial counsel had never made an attempt to locate witnesses, particularly Jeffrey Cross, or other exculpatory evidence.

According to the petitioner, he believed until the day of trial that they would be proceeding with an insanity defense. He stated that this should make clear that trial counsel did not fully inform him or discuss trial strategies during the representation. The petitioner also complained regarding trial counsel's handling of the motion to suppress. He specifically faulted trial counsel for failing to raise the issue of the latex gloves containing the co-defendant's DNA and that the motion should have been heard prior to the day before trial to give the court more time to consider the issues raised.

The petitioner also complained about two jurors which were included on the panel. The first, Marcella Romine, worked with the petitioner and was aware of his involvement in a check-kiting scheme at United Knitting. Ms. Romine did indicate during voir dire that she was familiar with the petitioner. According to the petitioner, when he informed trial counsel of this, trial counsel told him, "Let's see how it plays out." The petitioner also testified that he felt he was also prejudiced by the presence of Juror Duggan, who indicated that he had some knowledge of previous events concerning the petitioner. The petitioner felt that trial counsel should have at least filed a motion to change venue in order to have more of a selection of jurors who had not heard of his case or were familiar with the parties. The petitioner also testified that trial counsel should have hired a drug expert because he was under the influence when he was questioned by the police. Finally, he indicated that trial counsel should have brought up the issue of his mother's involvement in the check-kiting scheme as a possible ground to support provocation.

After hearing the evidence presented, the post-conviction court determined that the petitioner had failed to establish his entitlement to relief and denied the petition. This appeal followed.

**Analysis**

On appeal, the petitioner contends that the trial court erred in denying his petition for relief because he was denied his right to the effective assistance of counsel. The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations to support his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2010); *see also Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his grounds by clear and convincing evidence, the trial court must then determine whether trial

-11-

counsel was ineffective according to *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Dellinger*, 279 S.W.3d at 293-94. On appeal, this court is bound by the post-conviction court's findings of fact unless it concludes that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, this court must review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id*. at 458.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show: (1) that counsel's performance was deficient; and (2) that the deficiency was prejudicial. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id*. at 697. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show "that there is a reasonable probability that, but for" the substandard performance, "the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

On appeal, the petitioner contends that he was "consistently denied effective assistance of counsel," stating that the denial "plagued the original proceedings," and arguing that the record "paints a picture of inadequate preparation . . . and ineffective communication between counsel and client." The petitioner bases his claim on trial counsel's failure to meet with him enough to sufficiently discuss the case and develop trial strategy, failure to argue the motion to suppress before one day prior to the trial thereby depriving the trial court of adequate time to consider the motion, and failing to strike or challenge two jurors who knew the petitioner or were familiar with the facts of the case. While raising these alleged deficiencies, the petitioner's main contention appears to be that trial counsel failed to adequately prepare and present a defense based upon the petitioner's mental condition at the times the crimes were committed. He acknowledges that trial counsel attempted to explore this option, but contends that he went about it "in a disorganized and ineffective manner."

-12-

The petitioner finds fault with the timing of hiring Dr. McCoy and the failure to utilize the services of Dr. Heide, as well as other health service professionals whom the petitioner had met with over the years.

In its written order denying relief, the post-conviction court made the following findings:

> The petitioner complains, among other things, that his trial counsel did not call one Jeff Cross as a witness, that he did not challenge one of the jurors, that he did not adequately discuss the case with him or involve him in planning strategy of the trial, and, more significantly, that he did not present an insanity defense for him at trial.
>
> Trial counsel testified that Jeff Cross was an early suspect as a potential codefendant to the murder, and that he had made every effort to locate him and use him as a witness at trial. Counsel further testified that Cross simply could not be found to be served a subpoena as a potential witness at trial.
>
> While he was unable to be served a subpoena to testify at the original trial, Jeff Cross was available and testified at the Post Conviction hearing in this cause. His testimony revealed that he was, at the time of his testimony in this hearing, back in custody in the Bradley County jail.
>
> Cross also testified that, when these killings occurred, he was on parole, and that he fled to Florida, where he remained until picked up and extradited to Tennessee. He specifically testified that he left Tennessee so he wouldn't have to testify in the original trial.
>
> His testimony revealed that he knew both [the petitioner] and his codefendant . . . prior to these killings, and that they had both discussed the possibility of going to the apartment of the deceased victims and killing them. Cross also said that he had on an earlier occasion actually talked [the petitioner] out of going to the apartment and killing the victims.
>
> Trial counsel was in no way deficient in his representation of petitioner by not using Cross as a witness. Cross was unavailable and his unavailability at the trial in this cause was of his own choosing. The court also finds that the testimony of Cross would not only <u>not</u> have been helpful but also that his testimony would have been detrimental to any defense proposed by petitioner at trial.

-13-

This issue is without merit and presents no ground on which post conviction relief can be granted.

Petitioner further complains that trial counsel did not challenge one of the jurors who remained on the case. Trial counsel testified that he did not remember the particular juror involved. Petitioner, however, failed to put on any proof that this in any way affected the verdict of the jury. Again, proof that the defendant was involved in the killing of the two victims was overwhelming, and, absent any showing that the failure to exercise a preemptory challenge for the particular juror in question in any way affected the jury verdict, this issue is without merit and presents no grounds on which post conviction relief can be granted.

Petitioner further complains that trial counsel did not adequately discuss the case with him or involve him in planning strategy of the trial of that case. Counsel testified that he met with petitioner on several occasions. Counsel further testified that he had tried many criminal cases for his career and had found that, while meeting with a defendant for hours on end might make a defendant feel better, it often does nothing but take away valuable time to prepare for the case.

This issue is without merit and presents no grounds on which post conviction relief can be granted.

Petitioner further alleges that trial counsel was deficient in that he did not present an insanity defense for him at trial. The proof, however, is that Hiwassee Mental Health Center found, after an evaluation, that an insanity defense could not be supported.

Trial counsel further retained the services of Dr. Dian[a] McCoy for further mental examination of the [petitioner]. Her opinion concurred with the earlier opinion of Hiwassee Mental Health Center, and she did not feel that an insanity defense could be supported.

It goes without saying that any insanity defense must concede that the crime occurred, but that the defendant, because of his mental condition, did not appreciate the seriousness of the crime or could not, because of mental reasons, form the requisite culpable mental state. Trial counsel testified that, because of these reports, he did not think that an insanity defense would work in this case and further thought that the risk he would run in trying to use such

-14-

a defense was not worth the risk in giving up the other available defenses.

. . . .

This issue is without merit and presents no grounds on which post conviction relief can be granted.

There was no evidence to show that counsel was in any way ineffective in his defense of the petitioner. All claims for Post Conviction Relief set forth in his petition pertaining to this issue are hereby dismissed.

Following review of the record, we conclude nothing preponderates against the findings of the post-conviction court. With regard to the number of meetings and discussion of the case, trial counsel, an experienced lawyer, testified that he believed he had met with and discussed the case sufficiently with the petitioner. He further stated that, although it might have made the petitioner feel better, any additional meetings might in fact have hampered his preparation of the defense. The only evidence presented by the petitioner in regard to this allegation was his own testimony that he felt more meetings and discussions would have changed the outcome of the trial. Based upon its findings, the post-conviction court clearly accredited trial counsel's testimony. On appeal, it is not the province of this court to re-evaluate credibility determinations made. *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

With regard to the two jurors who remained on the panel during trial, the post-conviction court also correctly ruled that the petitioner had simply failed to put forth any proof with regard to how their knowledge affected the verdict. While the petitioner did testify that he had a negative relationship with the co-employee, nothing else in the record substantiates this claim. The only evidence admitted by the petitioner in this regard establishes that they were co-workers at the time of the murders. That relationship or the second juror's "prior knowledge" of a separate incident does not in and of itself establish that the verdict was affected. The petitioner asks this court to employ supposition and grant relief on what "could" have affected the verdict. The petitioner failed to produce any witness at the post-conviction hearing who offered concrete testimony on how these factors weighed in reaching the verdict. As such, he has failed to meet his burden of entitlement to relief. *See Id*. at 757.

For the same reason, the petitioner's claim regarding the timing of the motion to suppress hearing must fail. Nothing in the record establishes that if the hearing had been earlier, the decision of the trial court would have been different. The issues raised in the motion to suppress were litigated at motion hearing and also heard on appeal to this court,

who concluded no reversible error existed. The petitioner has failed to carry his burden in this aspect.

Lastly, with regard to the failure to pursue a possible mental defense more extensively, we also conclude that nothing preponderates against the post-conviction court's finding. It is clear that trial counsel was aware of the petitioner's prior history with regard to the finding of not guilty by reason of insanity. Indeed, trial counsel testified that he considered that a possible alternative for the petitioner at trial and pursued research into that defense. He had the petitioner evaluated and then, further, engaged the services of a qualified psychologist to evaluate the petitioner as well. Dr. McCoy had issues with the petitioner's credibility about certain facts and found nothing helpful with regards to this type of mental defense. When Dr. McCoy performed this evaluation she was also aware of the petitioner's prior history and had spoken with Dr. Heide.

Dr. Heide acknowledged that she had no opinion as to the petitioner's mental state at the time of the murders. Any interviews or evaluations she conducted in this case were after the petitioner had been convicted. Moreover, she acknowledged she was given no records in the case and her conclusions were strictly based upon information received directly from the petitioner. While she expressed her opinion that her information could have affected the jury's verdict with regard to the provocation issue because of the petitioner's history of abuse, that it not sufficient to establish either deficiency or prejudice. Trial counsel made a strategic decision not to utilize the services of Dr. Heide and cannot be faulted for that decision. While, in retrospect, her testimony might have affected the verdict, trial counsel was in no way deficient for pursuing the strategy he chose after adequate preparation. *See Cooper*, 847 S.W.2d at 528. This issue is without merit.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE